UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MARY P. STEPHENS, | ) | Civil Action No.: 4:06-1319-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| ASSOCIATED MEDICAL SPECIALISTS, | ) | |
| P.A. d/b/a COASTAL CANCER CENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  Plaintiff alleges a cause of action for retaliatory discharge pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  Presently before the Court is Defendant's Motion for Summary Judgment (Document # 15).   All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY

Plaintiff was hired by Defendant Associated Medical Specialists, P.A., d/b/a Coastal Cancer Center ("Defendant" or "Coastal Cancer") as Human Resources Director in March of 2001. Pickering Aff. at ¶ 3 (attached as Ex. B to Defendant's Motion).  She served in this position until her termination on March 22, 2005.  Plaintiff alleges that she was terminated in retaliation for "the acceptance and processing of a charge of sexual harassment–and because her continued activities and responsibilities as Director of Human Resources . . . would expose actionable sexual harassment

by Dr. Holt." Plaintiff's Response at 16.

Tracey Doyle was employed with Coastal Cancer until May of 2004. Doyle Dep. at 51. She left her employment with Coastal Cancer because of pain she was having and future surgeries she was facing as a result of endometriosis. Id. at 48, 51.

On Sunday, March 13, 2005, Plaintiff received a call at home from Tracey Doyle's husband, Chris. Plaintiff Dep. at 192. Chris Doyle told Plaintiff that he had discovered that his wife had a sexual encounter with Dr. Lawrence Holt, a physician and owner of Coastal Cancer, the previous Thursday evening and he was trying to find Dr. Holt's phone number. Id. at 192. Plaintiff testified as follows regarding her telephone conversation with Chris Doyle:

> He said, "You just need to know what kind of man you're working for. I wanted you to know that the reason Tracey left the employment up there was because she was being sexually harassed by Dr. Holt." I said that she'd never made that comment to me while she was employed there, and that was the end of that.

Id. at 193.

Thereafter, Plaintiff informed Alice Pickering, Coastal Cancer's Practice Administrator, of Chris Doyle's phone call, including his statement regarding the sexual encounter the previous Thursday night and the statement regarding the sexual harassment while his wife was employed at Coastal Cancer. Id. at 199. Pickering told Plaintiff not to talk to Dr. Holt or anyone else about Chris Doyle's phone call. Id. at 199-200.

Dr. Holt testified that he had been contacted by Chris Doyle and by Pickering. Holt Dep. at 180, 182. Pickering told Dr. Holt that Chris Doyle had contacted the Coastal Cancer office regarding his sexual encounter with Tracey Doyle the previous Thursday night. Id. at 182-183. Immediately

after his conversation with Pickering, Dr. Holt went to his attorney's office.[1] Id. at 183.

Plaintiff's employment with Coastal Cancer was terminated on March 22, 2005. She was told in her exit interview that she was not a "good fit" for Coastal Cancer. Plaintiff Affidavit.

In her Response to Defendant's Motion for Summary Judgment, Plaintiff also sets forth facts regarding Dr. Holt's relationship with another employee of Coastal Cancer, Annette Medlin. In February of 2004, Dr. Holt took several employees and their significant others on a trip to the Bahamas. Plaintiff Dep. at 127-128. Plaintiff and her husband, Annette Medlin and her boyfriend, Randy, and Angie Brinnegar, another nurse at Coastal Cancer, and her husband, Jim, went on the trip with Dr. Holt. Id. The group stayed on a boat owned by Dr. Holt, and Dr. Holt arranged for a private flight for the group, which was piloted by Plaintiff's husband. Holt Dep. at 61, 87-88.

The group arrived in the Bahamas on a Friday afternoon, and the next day Dr. Holt took Medlin and Brinegar on a trip on a dingy. Holt Dep. at 68. While on the dingy trip, Medlin kissed Dr. Holt on the cheek. Brinegar Aff. at Ex. 1; Holt Dep. at 65. The group appeared to be intoxicated when they returned from the dingy trip. Plaintiff Dep. at 152. Later that evening, Medlin and Dr. Holt engaged in sexual relations. Holt Dep. at 117. According to Dr. Holt, the sex was consensual and Medlin was the initiator. Id. Medlin claims that Dr. Holt sexually assaulted her. Medlin EEOC Charge (attached to Plaintiff's Response). Plaintiff testified as follows regarding that evening:

> My husband and I were awakened at a knock at our door. Annette Medlin came into our cabin. She was hysterical. She was crying. I asked her what was wrong. She said she had gotten up to get something for her stomach. Prilosec or,

---

[1]The nature of Dr. Holt's conversation with his attorney, Henrietta Golding, Esq., is subject to a pending Motion for Protective Order (Document # 30) filed by Defendant and a pending Motion to Compel (Document # 33) filed by Plaintiff. However, neither party argues that a determination of the nature of the conversation is necessary for a resolution of Defendant's Motion for Summary Judgment.

> and Dr. Holt was on the sofa.  He had grabbed her, kissed her, tried to force her down on top of him or something to, she was, she was very hysterical.  That Randy had come out and caught Dr. Holt, that she had tried to explain to Randy what was going on, and he went back to the cabin and had locked her out.
>
> So I told her then, I would be glad to just move over, she could lay down on the edge of our bed and stay with us, and she said "No," she thought Dr. Holt had left the cabin or left the yacht and that she would go up and sleep on the sofa.

Plaintiff Dep. at 166.  The following day, Dr. Holt told Plaintiff, "what happens in the Bahamas stays in the Bahamas."  Id. at 165.  Plaintiff testified that she did not become aware that Medlin and Dr. Holt actually had sex during the Bahamas trip until June of 2004, when Brinegar told her Id. at 171.  Medlin claims that she was sexually assaulted by Dr. Holt on two other occasions during her employment with Defendant.  Medlin Dep. at 105.  Dr. Holt admits to having sexual intercourse with Medlin on one other occasion.  Holt Dep. at 70.  Plaintiff was unaware of these other encounters until Medlin told her in September of 2005, after Plaintiff's employment was terminated.  Plaintiff Dep. at 269-270.  Plaintiff testified that she had suspicions about what was going on between Dr. Holt and Medlin, but she never had any discussions with Pickering about anything that ever occurred between Dr. Holt and Medlin.  Id. at 177, 185.

Defendant asserts that Plaintiff was terminated as a result of her continued poor work performance.  As Human Resource Manager, Plaintiff's job duties included, among other things, maintaining and promoting all employee benefits at 90 days and annually, maintaining all job postings and job advertisements, assisting all department managers with employee discipline and documentation, and maintaining employee data and completing employee payroll.  Ex. C to Defendant's Motion.  Pickering was responsible for supervising Plaintiff and evaluating her job performance.  Pickering Aff. at ¶ 2.  In Plaintiff's first Annual Performance Review, dated March 23, 2002, Plaintiff received a "needs improvement" score in the areas of demonstrating accuracy and

-4-

thoroughness, planning for additional resources, setting goals and objectives, and generating suggestions for improving work. Ex. D to Defendant's Motion. She received a score of "meets job requirements" or "exceeds job requirements" in all other areas. Id. Her overall rating was "meets job requirements." Id. Pickering commented that Plaintiff "is excellent at handling employees and their problems" and "is very dependable and trustworthy" but that Plaintiff "needs to strengthen her prioritization and organization." Id. She also commented that "[i]t is very important for public relations purposes for [Plaintiff] to answer calls whenever possible, return calls as soon as possible and sent out interview follow-up letters timely." Id.

In her second Annual Performance Review, dated April 17, 2003, Plaintiff received an "unsatisfactory" score in the areas of demonstrating accuracy and thoroughness, and monitoring own work to ensure quality. Ex. E to Defendant's Motion. She received a score of "needs improvement" in numerous areas, and an overall rating of "needs improvement." Id. Pickering commented,

> [Plaintiff's] job performance until the last month had been unsatisfactory in the following areas: she did not follow-through on tasks thoroughly, accurately or timely. Her punctuality was a problem, thus not leading by example in a key position. Some examples of unacceptable work are as follows: the Employee handbook has not been updated or brought to the Board of Directors even though requested, an employee requested a pay increase months prior to being taken to the Board, job openings have not always been kept current, job postings in the Sun News have been inaccurate or not submitted timely, and all physicians were not aware of a recent physician candidate's interview with us, thus causing insecurity in a non-owner physician.

Id. Pickering indicated that Plaintiff would be reevaluated in ninety days. Id.

On July 11, 2003, Plaintiff received a Corrective Action form for violation of company policies and procedures. Ex. F to Defendant's Motion. Specifically, Plaintiff received a warning for failing to bring employee requests to the attention of the Board of Directors and for failing to issue a written warning to an employee where one was warranted. Id.

On October 6, 2003, Plaintiff received a follow-up evaluation. Ex. G to Defendant's Motion. Pickering noted that Plaintiff's accuracy, follow-through and punctuality had improved but needed continued improvement. Id. Pickering also indicated that Plaintiff needed to continue to learn about Human Resources. Id. Finally, Pickering indicated that Plaintiff would need to regain respect and trust from her peers. Id.

Plaintiff's third Annual Performance Review was completed on March 23, 2004. Ex. H to Defendant's Motion. Plaintiff received a score of "needs improvement" in the area of demonstrating accuracy and thoroughness. Id. Her overall rating was "meets job requirements." Id. Pickering commented that "[Plaintiff] has been from one end of the spectrum to the other this year. She has gone from one of the most unsatisfactory employees to one of the most improved." Id. She further noted that "[Plaintiff] has gained some respect and trust back, however, she must continue to work on this." Pickering emphasized that Plaintiff must "follow through on her job duties and commitments timely" and "be consistent with the amount of work she does, irregardless what is going on any given day, whose request she is working on, of if her supervisor is here or not. She needs not to allow personal distractions to keep her from being productive." Id.

The third Annual Performance Review also listed four goals for Plaintiff to meet during the 2004 calendar year: 1) obtain National Human Resource Certification, 2) with approval, produce and provide employee benefit statements, 3) produce payroll with 100% accuracy for 2004, and 4) continue to work on organizational skills. Id. At the time of Plaintiff's termination in March of 2005, Plaintiff had not obtained National Human Resource Certification or produced payroll with 100 percent accuracy. Plaintiff Dep. at 83-85.

Pickering documented a coaching session that she had with Plaintiff on September 29, 2004.

-6-

Ex. I to Defendant's Motion.  She indicated in the memo that

> the purpose of this coaching session is to make [Plaintiff] aware that her work has regressed to an unacceptable level . . . .  For example, [Plaintiff] has not been following up with ads, repetitively allowing them to expire, or, at times, not getting ads in at all.  Administrative personnel should not have to ask [Plaintiff] to do her job and do it timely.  If for some reason it cannot be done timely, it is her responsibility to let the appropriate Administrative personnel know, instead of them having to inquire.  It appears as if she has been spending an inappropriate amount of time on phone calls.

Id.

In early March of 2005, Pickering received a phone call from Courtney Hucks, a representative with AFLAC.  Pickering Aff. at ¶ 8.  AFLAC was an insurance provider to Coastal Cancer employees who elected to subscribe to an AFLAC cancer policy offered by Coastal Cancer. Id.  Hucks described her many attempts to contact Plaintiff and her exasperation with Plaintiff for failing to return her calls.  Id.  Pickering asked Hucks to document in an email her attempts to contact Plaintiff.  Id.

In the email, dated March 9, 2005, Hucks states that she had been trying to set up an enrollment with Plaintiff since September and that another AFLAC representative had been trying to contact Plaintiff for approximately two years to set up an enrollment.  Ex. O to Defendant's Motion.  Hucks and the other associate wanted to speak to new employees regarding the policies AFLAC offered and speak to the employees that had policies with AFLAC regarding the various upgrades that were available.  Ex. O to Defendant's Motion; Hucks Dep. at 9.  Near the end of September, Hucks stopped by Coastal Cancer to speak with Plaintiff and was told that Plaintiff was not available.  Ex. O to Defendant's Motion; Hucks Dep. at 9.  She was told to contact Plaintiff to set up an appointment. Ex. O to Defendant's Motion; Hucks Dep. at 9.  Hucks then began calling

-7-

Plaintiff every two to three days and finally got a hold of her in approximately mid-October.  Ex. O

to Defendant's Motion; Hucks Dep. at 9-10.  Plaintiff informed her that she needed to discuss some

things with the Board and that she would call her back in a month.  Ex. O to Defendant's Motion;

Hucks Dep. at 13.

When Hucks did not hear from Plaintiff, she contacted her in late November.  Ex. O to

Defendant's Motion; Hucks Dep. at 13.  At that time, Plaintiff told Hucks that she wanted to see

copies of all the cancer policies offered by AFLAC.  Ex. O to Defendant's Motion; Hucks Dep. at

13.  Hucks agreed to send a copy of the policies and also asked Plaintiff if she would sign a service

evaluation.  Ex. O to Defendant's Motion; Hucks Dep. at 13.  Plaintiff asked Hucks to send the

service evaluation along with the copies of the policies and she would sign it and send it back.Ex.

O to Defendant's Motion; Hucks Dep. at 15.  Hucks called Plaintiff approximately two weeks later

and Plaintiff indicated that she would go ahead and sign the service evaluation and send it back.  Ex.

O to Defendant's Motion; Hucks Dep. at 15.

Hucks went back to the Coastal Cancer office in January after not having received the signed

service evaluation and asked to see Plaintiff. Ex. O to Defendant's Motion; Hucks Dep. at 15.  She

was told Plaintiff was in a meeting and would not be available for a while.  Ex. O to Defendant's

Motion; Hucks Dep. at 15.  Hucks indicated that she would wait for Plaintiff to get out of the

meeting and waited for approximately ten or fifteen minutes when Plaintiff's assistant came out to

speak with her.  Ex. O to Defendant's Motion; Hucks Dep. at 16.  Hucks explained to the assistant

that she needed Plaintiff to sign the service evaluation, so the assistant left and came back with the

signed evaluation. Ex. O to Defendant's Motion; Hucks Dep. at 16.  Hucks told the assistant at that

time that she also needed to set up a time to come in a speak to the employees regarding the policies.

-8-

Ex. O to Defendant's Motion; Hucks Dep. at 17. The assistant indicated that she would talk to Plaintiff about setting up a time. Ex. O to Defendant's Motion; Hucks Dep. at 17. Hucks continued to call Plaintiff about setting up a time to meet but never was able to get in touch with her. Ex. O to Defendant's Motion; Hucks Dep. at 18. Hucks finally contacted Pickering in early March of 2005. Ex. O to Defendant's Motion; Hucks Dep. at 18.

According to Pickering, "[Plaintiff's] incompetent handling of the situation and failure to communicate with the AFLAC representative was unacceptable and jeopardized [Coastal Cancer's] relationship with its employees and compromised employee benefits." Pickering Aff. at ¶ 9. She decided to present to the Board of Directors her conclusion that Plaintiff be terminated. Id. at ¶ 10. The next meeting of the Board of Directors was March 21, 2005. Id. Pickering avers as follows regarding that meeting,

> At that meeting, I discussed [Plaintiff's] performance issues, her evaluations, and the email I received from Mrs. Hucks. The Board voted to support my request for termination with the sole reason for termination being [Plaintiff's] poor job performance. Dr. Lawrence Holt was present during the meeting, but did not discuss [Plaintiff] and did not participate in any way in the vote regarding the decision to terminate [Plaintiff].

Id. On March 22, 2005, Pickering and Dr. Goldberg met with Plaintiff and informed her that her employment with Coastal Cancer was ended. Id. at ¶ 11.

Plaintiff filed this action on May 1, 2006. In her Complaint, Plaintiff alleges that she exhausted her administrative remedies by filing a Charge of Discrimination with the South Carolina Human Affairs Commission (SHAC) and the Equal Employment Opportunity Commission (EEOC) and commenced the action within ninety days of her receipt of the Notice of Right to Sue from the EEOC. Complaint at ¶ 6.

## III.     SUMMARY JUDGMENT STANDARD

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. at 323. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also

<u>Celotex</u>, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves").   To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings.  Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." <u>Celotex</u>, 477 U.S. at 322.  <u>See also</u> <u>Cray Communications, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390 (4th Cir. 1994); <u>Orsi v. Kickwood</u>, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

Plaintiff alleges that her termination was in retaliation for her report to Pickering regarding the comment made by Chris Doyle that his wife, Tracey, had been sexually harassed by Dr. Holt when she was employed by Defendant.  According to Plaintiff, it is her "belief" that Dr. Holt participated in her termination to "protect his own reputation from what would come from the alleged complaint of Mr. Doyle in reference to Tracey, and once that was out that I believe the information would come out about Ms. Medlin and their relationship."  Plaintiff Dep. at 263.

Title 42, Section 2000e-3(a) of the United States Code provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The burden-shifting scheme set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), applies in analyzing retaliation claims under Title VII.  <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234 (4th Cir.2000).  The Plaintiff must first set forth a <u>prima facie</u> case of retaliation.

To establish a <u>prima facie</u> case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985), <u>overruled on other grounds</u>, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

To establish "protected activity" Plaintiff must show she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring. <u>Bigge v. Albertsons, Inc.</u>, 894 F.2d 1497, 1503 (11th Cir.1990); see also <u>Ross</u>, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of sexual harassment was in fact meritorious in order to prevail).

Plaintiff asserts that she engaged in protected activity through her "acceptance and processing of a charge of sexual harassment." Plaintiff's Response at 16. Defendant argues that Plaintiff did not engage in protected activity because her report to Pickering of the alleged sexual harassment by Dr. Holt against Tracey Doyle was a part of her job responsibility as Human Resources Director. In support of this argument, Defendant cites <u>Vidal v. Ramallo Bros. Printing, Inc.</u>, 380 F.Supp.2d 60 (D.P.R. 2005), in which the court held that Plaintiff did not engage in protected activity when, in his capacity as human resources director, he informed employer's president and vice-president that he was initiating a sexual harassment investigation against them. <u>Vidal</u>, 380 F.Supp.2d at 62. The <u>Vidal</u> court reasoned that "[i]n cases where it is a third party who is attempting to help the alleged victim of discrimination assert her rights, 'protected activity' is limited to activity that is adverse to the company, or outside the employee's normal employment role." <u>Id.</u> The court found that the plaintiff "was working in his capacity as a Human Resources Director, for the benefit of the

-12-

company, and in accordance with its policies forbidding sexual harassment" and that his "actions were not adverse to the company, and were part of his job responsibilities; thus, these actions neither constitute a protected activity as defined by Title VII nor amount to opposing an illegal practice on his employer's part." Id.

While the Vidal court's reasoning is sound, it is not binding on this court. Defendant also relies on Crowley v. Prince George's County, 890 F.2d 683 (4th Cir. 1989) for its argument that Plaintiff did not engage in protected activity. However, in Crowley, the Fourth Circuit noted that the plaintiff "complains . . . not that he has been retaliated against for investigating discriminatory employment practices within the police department, but for investigating instances of racial harassment perpetrated by police officers against members of the community. Id. at 687 (emphasis added). In the present case, Tracey Doyle was an employee of Coastal Cancer at the time the alleged sexual harassment occurred. Thus, Defendant's reliance on Crowley is misplaced. With no guidance from the Fourth Circuit on this particular issue, the undersigned declines to find that Plaintiff did not engage protected activity simply because she was acting in her role as Human Resources Manager at the time.

Plaintiff clearly suffered an adverse employment action when she was terminated from employment with Defendant. See Burlington Indust., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Thus, Plaintiff must next establish that a causal connection exists between her protected activity and her termination. Plaintiff asserts this connection exists in light of the fact that she was terminated only eight days after she reported the allegation of sexual harassment to Pickering. To prove a causal connection based on temporal proximity alone, the time between the protected activity and the adverse employment action must be "very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268,

273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Because the adverse employment action occurred only eight days after the alleged protected activity, there is a genuine issue of material fact as to whether a causal connection exists between the two events. See Mitchell v. Secretary of Veterans Affairs, 467 F.Supp.2d 544, 554 (D.S.C. 2006) (finding genuine issue of material fact as to causal connection where adverse employment action occurred three weeks after protected activity).

Because Plaintiff has established a prima facie case of retaliation, the burden shifts to Defendant to produce a legitimate, non-retaliatory reason for the adverse employment action suffered by Plaintiff. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). Once Defendants have met their burden of production, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not its true reason, but pretext for retaliation. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000). Throughout the burden shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the ultimate burden of proving that Defendants intentionally retaliated against Plaintiff remains at all times with Plaintiff.

Defendant has produced a legitimate non-retaliatory reason for Plaintiff's termination by setting forth Plaintiff's history of poor performance as Human Resources Director and her failure to promptly deal with the AFLAC account. According to Defendant, "Plaintiff's performance evaluations and her personnel file reveal a pattern of incompetence during her tenure as HR Director, which eventually resulted in her termination. Plaintiff's failure to respond to Courtney Hucks at AFLAC regarding employee benefits was the 'final straw' in Coastal Cancer's decision to terminate her employment." Defendant's Memorandum in Support of Summary Judgment at 19. However,

-14-

Plaintiff claims that this reason is merely pretext for retaliation.

Plaintiff asserts that the last Annual Performance Evaluation she received on March 23, 2004, one year prior to her termination, gave her an overall rating of "meets job requirements" and Pickering noted that Plaintiff was "one of the most improved employees" at Coastal Cancer.  Ex. H to Defendant's Motion.  However, in September of 2004, Pickering had a "coaching session" with Plaintiff.  Pickering documented that the purpose of the coaching session was to "make [Plaintiff] aware that her work has regressed to an unacceptable level."  Ex. I to Defendant's Motion.

Plaintiff also points to a hand written note she received from Pickering, which appears to be dated February 2, 2005.  Ex. to Plaintiff's Response.  In the note Pickering states "Your work has vastly improved.  Go forward not in another direction."  Id.  However, the note from Pickering was written before she received the phone call from Courtney Hucks with AFLAC in early March of 2005.  According to Plaintiff, however, "Defendant's claim that inattention to AFLAC required Plaintiff's termination is also pretextual."  Plaintiff's Response at 19.  Plaintiff avers in her affidavit that Pickering "had made it very clear to me over the years that I was employed with Coastal Cancer Center that she did not like the insurance provider AFLAC" and that "AFLAC coverage continued to be viewed in a very negative light by Mrs. Pickering."  Plaintiff Affidavit.  Plaintiff also stated,

> I was surprised to learn recently that Mrs. Pickering has purported that the reason I was fired was because I did not follow through with the AFLAC meeting in a more timely fashion.  I was told in my exit interview that I was not a "good fit" for Coastal Cancer Center and nothing about AFLAC was ever mentioned I had not seen the note written by Ms. Hucks to Mrs. Pickering about her trouble with getting an appointment for a seminar until my deposition in this litigation.  No one at Coastal Cancer Center ever mentioned the failure to set up this meeting as a reason for my dismissal in any way.

Id.  Plaintiff also states, "to my knowledge there was not a single negative report about my work

-15-

habits in the final six months of my employment." Id.

Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally retaliated against her for reporting the allegation of sexual harassment.  It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[2]  Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer")  It is the perception of the employer that is critical.  Hawkins, 203 F.3d at 280.  Even a reasoned decision based on incorrect facts is not evidence of pretext.  Pollard v. Rea Magnet Wire Co., 824 F.3d 557, 559 (7th Cir. 1987), cert. denied, 484 U.S. 977 (1987).

Defendant has presented evidence that Plaintiff had a history of less than satisfactory work performance.  In her deposition, Plaintiff agreed that the majority of the critiques she received were accurate.  Plaintiff Dep. at 59, 62-63, 65-66, 70, 72.  In addition, although Plaintiff avers that no one

---

[2] "Proof that the employer's proffered reasons in unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason . . . is correct." Reeves, 530 U.S. at 146-47.  "It is not enough to disbelieve the [employer]."  Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004).  Plaintiff must show a reasonable jury could believe her explanation of retaliation.  See id.

ever said anything to her about her inattention to the AFLAC representative, the problem was clearly documented by Hucks in the email she sent to Pickering on March 9, 2005.  Ex. O to Defendant's Motion.

It is also important to note that Plaintiff claims it is her "belief" that Dr. Holt participated in her termination to "protect his own reputation from what would come from the alleged complaint of Mr. Doyle in reference to Tracey, and once that was out that I believe the information would come out about Ms. Medlin and their relationship."  Plaintiff Dep. at 263.  However, Pickering averred that although Dr. Holt was present in the Board of Director's meeting, he "did not discuss [Plaintiff] and did not participate in any way in the vote regarding the decision to terminate [Plaintiff]."  Pickering Aff. at ¶ 10.  Plaintiff speculates that "Pickering's close allegiance to Holt . . . [makes] it reasonable to question Pickering's credibility, and to find that she and Holt were in league."  Plaintiff's Response at 21.  However, Dr. Holt's uncontroverted testimony is that "on the day of the board meeting, and in fact, the week before, [Plaintiff's termination] was not a topic of discussion.  I did not talk with anyone whatsoever regarding [Plaintiff's] termination."  Holt Dep. at 224.  Plaintiff has presented no evidence of Pickering's "allegiance" to Dr. Holt or that Pickering and Dr. Holt were "in league."  Plaintiff may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).

Plaintiff also argues that the timing of her termination shows that Defendant's proffered reason for the termination is merely pretext for a retaliatory reason.  Plaintiff was terminated eight days after she reported the allegation of sexual harassment.  However, although the timing of Plaintiff's termination is sufficient to show a causal connection between the two events to meet the

relatively low burden of establishing a <u>prima facie</u> case, it is not sufficient to establish that Defendant's reason for Plaintiff's termination is pretext.  <u>See</u> <u>Nelson v. J.C. Penney Co., Inc.</u>, 75 F.3d 343, 346 (8th Cir. 1996); <u>Gleason v. Mesirow Financial</u>, 118 F.3d 1134, 1147 (7th Cir. 1997). In fact, the timing of Plaintiff's termination is also in close proximity with Hucks' email to Pickering of March 9, 2005.  As averred by Pickering, after she spoke with Hucks and reviewed her email regarding Plaintiff's conduct with the AFLAC account, she concluded that she should present to the Board of Directors her recommendation that Plaintiff be terminated, and the next meeting of the Board of Directors was March 21, 2005.  Pickering Aff. at ¶ 10.  Plaintiff was terminated on March 22, 2005.  Thus, the proximity of both events was very close.  The proximity of Plaintiff's report of the allegation of sexual harassment to her termination is insufficient to create a genuine issue of fact as to the true reason for the termination of Plaintiff's employment.  To find a genuine issue of fact on the basis of temporal proximity alone "asks the court to move beyond inference and into the realm of mere 'speculation and conjecture.'" <u>Gibson  v. Old Town Trolley Tours</u>, 160 F.3d 177, 181 (4th Cir.1998) (internal quotation marks and citation omitted).  "[A] jury may ... not be allowed to infer [retaliation] from evidence that does no more than suggest it as a possibility." <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 245 (4th Cir.1982).

A plaintiff may prove pretext by submitting evidence that calls into question the veracity of the employer's reasons for its decision.  <u>Anderson v. Westinghouse Savannah River Co.</u>, 406 F.3d 248, 269 (4th Cir.2005); <u>Dennis v. Columbia Colleton Medical Center, Inc.</u>, 290 F.3d 639, 648-49 (4th Cir.2002).  Plaintiff in the present case has produced nothing more than her own beliefs, conjecture, speculation, and conclusory allegations regarding the veracity of Defendant's decision to terminate Plaintiff.  Furthermore, as stated above, "it is not enough to disbelieve the [employer]."

Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004).  Plaintiff must show a reasonable jury could believe her explanation of retaliation.  Id.  No reasonable jury could conclude from the evidence presented that Plaintiff's employment was terminated in retaliation for her report of the allegation of sexual harassment rather than for her history of and continued poor work performance.  As such, summary judgment is appropriate.

**V.    CONCLUSION**

For the reasons set forth above, it is recommended that Defendant's Motion for Summary Judgment (Document # 15) be granted.  If the district judge accepts this recommendation, all other pending motions shall be rendered moot.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 30 , 2007
Florence, South Carolina